UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SPENCER WILSON,

                              Plaintiff,

                                                                1:20-CV-0104(GTS/DJS)
v.

KYLE FAULKNER; and STEVEN FELLOWS,

                              Defendants.
_____

APPEARANCES:                                         OF COUNSEL:

SIM & DePAOLA, LLP                                SAMUEL C. DePAOLA, ESQ.
   Counsel for Plaintiff                                 SANG J. SIM, ESQ.
42-40 Bell Boulevard, Suite 405
Bayside, NY 11361

COOK, KURTZ & MURPHY, P.C.                    MICHAEL T. COOK, ESQ.
   Counsel for Defendant Faulkner
85 Main Street
P.O. Box 3939
Kingston, NY 12401

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

    This action was originally filed in the New York State Supreme Court, Ulster County,

and removed to this Court. Dkt. Nos. 1 & 2.  The case arises from a confrontation between

Spencer Wilson ("Plaintiff") and Brandan Fellows,[1] and Plaintiff's subsequent interaction with

law enforcement in Ulster County, New York.

_____

    [1] The various documents in this case use both "Brandon" and "Brandan" as Mr. Fellows'
first name. Because Mr. Fellows was sued in this case under the name "Brandan R. Fellows,"
Am. Compl., Dkt. No. 10, and is referred to similarly in the factual section of the Second
Amended Complaint, Dkt. No. 42 at ¶ 22, the Court uses "Brandan" as Mr. Fellows' first name.

On March 17, 2022, the Hon. Thomas J. McAvoy, Senior United States District Judge, issued a Decision and Order that decided motions brought pursuant to Fed. R. Civ. P. 12(b)(6) by (1) Defendants Town of Ulster, Kyle Faulkner, William Moylan, P.O. Sickler, P.O. Gramoglia, P.O. Reavy, and John or Jane Doe 1-10 to the extent they are affiliated with the Town of Ulster (collectively, "Town Defendants"), Dkt. Nos. 43, 45, and (2) County of Ulster and John or Jane Doe 1-10 to the extent they are alleged to be employees or acting on the behalf of the County of Ulster (collectively, "County Defendants"), Dkt. No. 44. Dkt. No. 51 at 1-2.[2]  After reviewing the motions, Judge McAvoy held as follows:

> [T]he Town Defendants' motion to dismiss, Dkt. Nos. 43, 45, [is] GRANTED in part and DENIED in part. The motion is denied in that claims asserting the false arrest/improper seizure of Plaintiff by Defendant Faulkner remain viable, but is granted in that all other claims against Town Defendants are DISMISSED. The County Defendants' motion to dismiss, Dkt. No. 44, is GRANTED, and all claims against the Town Defendants are DISMISSED.

*Id.* at 37.  Although Judge McAvoy granted leave to move to amend the Second Amended Complaint (SAC), *id.* at 38, the Hon. Daniel J Stewart, United States Magistrate Judge, denied Plaintiff's subsequent motion to amend. Dkt. No. 58.

The claims remaining against Defendant Faulkner ("Faulkner") are for false arrest and false imprisonment in violation of New York state law and the U.S. Constitution. SAC at ¶¶ 95-106.  Plaintiff's federal claims are brought pursuant to 42 U.S.C. § 1983. *Id.* at ¶¶ 102-06. Faulkner moves for summary judgment on these claims. Dkt. No. 70.  Plaintiff opposes this motion, Dkt. Nos. 79-80, and Faulkner files a reply. Dkt. No. 81. The Court will decide the pending motion on the papers and without oral argument.  For the following reasons, Faulkner's motion is granted.

---

[2] The motions before Judge McAvoy were addressed to the claims asserted in the Second Amended Complaint, Dkt. No. 42 ("SAC"), which is still the operative pleading.

I.      **RELEVANT BACKGROUND**[3]

Plaintiff's Account of Relevant Circumstances

Plaintiff testified that in January of 2019, he was living at 188 Wrentham

Street, in the City of Kingston, New York, with his daughter, Alyssa Wilson, and her boyfriend,

Brandan Fellows ("Brandan"). Def. Ex. A (50-h Hearing Trans.), Dkt. No. 70-4, pp. 4-5.  On

January 23, 2019, Plaintiff and Brandan were involved in a physical altercation at Plaintiff's

home. Statement of Material Facts, Dkt. No. 70-3 ("Def. SOMF"), ¶ 1.[4] The physical altercation

related to construction work that was to be performed for Plaintiff by Brandan's father. Def. Ex.

A, p. 11. According to Plaintiff, he paid for that work but Brandan's father had "disappeared."

*Id.* Plaintiff contends that he told Brandan that he was going to hold his father's tools until the

father talked with Plaintiff, which purportedly caused Brandan to attack Plaintiff. *Id.* Plaintiff

stated at his deposition that, when he was bringing some of Brandan's father's tools upstairs,

Brandan attacked him from the back, threw him on the stairs face first, and put him in a

chokehold. Def. Ex. B (Wilson Dep. Trans.), Dkt. No. 70-5, at p. 24. Brandan and Plaintiff's

daughter then left the residence. *Id.* at 25.  Plaintiff did not report the incident of January 23,

2019, to the police. Def. SOMF ¶ 2.

At approximately 11:00 a.m. on January 24, 2019, Brandan returned to the home. *Id.* ¶ 3.

Plaintiff contends that Brandan began knocking on his bedroom door, Def. Ex. A, pp. 16-18, and

---

[3] On the pending motion, the Court considers the admissible evidence submitted by the parties. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001). In doing so, the Court construes the evidence in the light most favorable to Plaintiff. *Doninger v. Niehoff*, 642 F.3d 334, 344 (2d Cir. 2011).

[4] Unless indicated otherwise, the Court cites to Defendant Faulkner's Statement of Material Facts where Plaintiff has either admitted the facts asserted, or failed to adequately oppose a properly supported fact.

then "charged" into the room and attempted to grab Plaintiff's rifle, which was leaning against

the closet. *Id.* at pp. 20-21. The rifle was an AR-15 type rifle. *Id.* at p. 57. Plaintiff maintains that

he and Brandan wrestled for control of the rifle, and that, during the struggle (when Brandan was

punching Plaintiff in the head and kneeing and kicking him in the ribs), Plaintiff laid on the rifle

on the floor in an attempt to prevent Brandan from gaining control of it. *See id.* at p. 21 ("I

actually just tucked it because he was grabbing at it and I tucked it (Indicating) and I ended up on

the floor over top of it."); Def. Ex. B  (Wilson Dep. Trans.), Dkt. No. 70-5, at p. 27 ("I laid down

on it . . . when he was attacking me."). Plaintiff asserts that he was "in and out of consciousness

pretty much the whole time [Brandan] was hitting [him] in the  head," stating that he believed

Brandan was using a pair of brass knuckles. Def. Ex. B at pp. 26-27. Plaintiff contends that,

although the rifle was not previously loaded, the struggle for control of the rifle caused a live

round to be loaded in the firing chamber. *See* Def. Ex. A at p. 24 ("Q: When did it become

loaded? A: When I was on the ground and the magazine got locked in  . . . , the magazine got

locked forward and the bolt went forward chambering a round so it was chambered when I was

on the ground."); Def. Ex. B  at p. 27 ("Q: Was the rifle loaded?  A. No, no. The magazine was .

. . in. It was—it would lock back, but it was not loaded. It was at the ready. But what happened

when—when I laid down on it and when he was attacking me, the magazine went forward—not

the magazine—the bolt moved forward and put a round in.").

Plaintiff asserts that, during the struggle, Brandan lifted him up to his feet but the struggle

for control of the rifle continued. Def. Ex. B at pp. 27-28. Plaintiff maintains that, during this

part of the struggle, his hands were not on the rifle's trigger mechanism but rather the rifle was

discharged by Brandan's actions pulling the rifle. *See id.* ("[Brandan] was trying to pull towards

the door with the rifle. And then the trigger—then the rifle went off. My hand was at the—the

barrel of the rifle and at the stock of the rifle, not anywhere near the trigger. And like I said, [Brandan] admitted that he was the one who pulled the trigger.");[5] Def. Ex. A. at p. 23 ("[Brandan] just stopped [his attack] and I had no energy and then he grabbed the rifle from underneath me and he picked the rifle and me up to our feet, drug me to the front—drug me to my bedroom door and I was holding the rifle by the barrel in the buttstock and he grabbed where the trigger is and the gun went off.").  Regardless of the cause of the discharge, there is no dispute that the rifle discharged while Plaintiff and Brandan wrestled over control of it. Def. SOMF ¶ 4.

Plaintiff contends that, after the rifle was discharged, he "just dropped" because he was so tired that he could not fight any more, and maintains that he does not remember Brandan leaving the room because he "was in and out of consciousness."  Def. Ex. B  at p. 28; *see also* Def. A at p. 25 ("I had no more energy and I dropped to the ground and I just—I just said now he's got the gun. He's either going to kill me or he's going to leave and I just—I didn't have any more energy to fight so I just dropped to the floor.").

Plaintiff asserts that, as a result of Brandan's attack, he received fifteen staples in the back of his head, five broken ribs, a broken shoulder blade, and bruising all over the back of his head and the left side of his body. Def. Ex. A at p. 23.  Plaintiff claims that Brandan left

---

[5] Plaintiff contends that Brandan originally said that Plaintiff discharged the weapon on the day of the incident, but that, at Plaintiff's second bail hearing, Brandan "admitted and changed his story and said that it was actually him who discharged the weapon, not me." Def. Ex. A at p. 56. This fact, which occurred after Faulkner arrested Plaintiff, is not relevant to the issue on the current motion which assesses Faulkner's decision based on information known to him at the time of the arrest. *See Rae v. Cnty. of Suffolk*, 693 F. Supp. 2d 217, 224 (E.D.N.Y. 2010) ("[A] court's inquiry must focus solely on the facts available to the officer at the time of arrest; facts subsequently learned, whether they tend to support or to negate the existence of probable cause are irrelevant to the false arrest claim.") (citing *Ricciuti v. New York City Transit Auth.,* 124 F.3d 123, 128 [2d Cir.1997]).

Plaintiff's bedroom with the rifle, and he made a series of phone calls, including to the Town of

Ulster Police Department. Def. Ex. A at pp. 26-28;[6] Def. Ex. B at pp. 28-29. Plaintiff contends

that he does not recall the sum and substance of the conversation with the Town of Ulster Police

Department, Def. Ex. A at p. at 28, but asserts that, before he told the dispatcher what happened,

he was told to look out the window. Def. Ex. B at pp. 28-29. Plaintiff maintains that, upon

looking out the window, he saw that "all the cops were already out there. They had the whole

street closed off," and saw that Brandan was outside with the rifle. *Id.* at p. 29.

Plaintiff asserts that, during his conversation with the Town of Ulster Police Department,

he was told to go outside. *Id.* Plaintiff exited the home and was instructed by the police to turn

around and get on the ground, before being handcuffed. Def. Ex. A at pp. 29-30. Plaintiff

contends that he "did everything they told me to do before [he] said anything and was laying on

the ground." Def. Ex. B at p. 29.  Plaintiff further contends as follows:

> Once they got me cuffed, I told them — I said, "He's the one that attacked
> me. I'm bloody. I'm beaten to hell. My clothes are ripped off. He's one [sic]
> that attacked me. Why am I getting arrested? Why are you putting me in
> cuffs? Meanwhile he's sitting there not in cuffs, not arrested, nothing. And
> then they put me back in — behind — in the cop car.

*Id.*

Plaintiff does not know the identities of any of the police officers who handcuffed him or

walked him to their vehicle for transport. Def. SOMF ¶ 9. Plaintiff was initially admitted to

Kingston Hospital for his injuries, and thereafter transported to St. Francis Hospital, in

Poughkeepsie, New York. Def. Ex. A at pp. 37-38.

<u>Faulkner's Involvement on January 24, 2019</u>

---

[6] Plaintiff claims he also texted his sister and a friend to advise of the attack and request
assistance. Def. Ex. A at p. 28.

Faulkner was employed by the Town of Ulster Police Department on January 24, 2019. Def. SOMF ¶ 5. On that date, Faulkner was working as a detective and received a dispatch call relating to a domestic incident with shots fired at Plaintiff's home. *Id.* ¶ 6. Upon arriving at the home, Faulkner retrieved his SWAT gear and joined a group of officers who had positioned themselves outside the home. *Id.* ¶ 7. Faulkner had seen Plaintiff exit the home but lost sight of him as Plaintiff approached the other officers, because Faulkner was focused on securing the home and ensuring that there were no other suspects. *Id.* ¶ 10. Faulkner and the other officers performed a sweep of the home to ensure that it was clear, and Faulkner thereafter returned to perform an investigation of the home. *Id.* ¶ 11. During his investigation, Faulkner recovered a shell casing in Plaintiff's bedroom, but the round was never recovered. *Id.* ¶ 12. Faulkner testified that he did not speak to Plaintiff at the scene, and instead believes Plaintiff spoke to Officer Sickler and Detective Sergeant Thomas. Def. Ex. C (Faulkner Dep. Trans.), Dkt. No. 70-6, at p. 30.

Plaintiff admits that, "[a]s part of [the SWAT team], Defendant FAULKNER was focused on securing the house, did not observe whether Plaintiff was injured when exited [sic] the house, and was involved in a very brief sweep of Plaintiff's residence that yielded no contraband. His sole contribution to the police investigation that led to the arrest of Plaintiff was the statement provided by Brandan to his fellow officers and a direct conversation with Plaintiff for approximately fifteen (15) minutes almost immediately after removing him from the hospital where he was being treated for his injuries sustained due to the conduct of the complaining witness, Brandan." Pl. Mem. L., Dkt. No. 80, at CM/ECF p. 11 (citing Def. Ex. C at 32:14 – 36:12, 51:24 – 60:20).

<u>Plaintiff's Interview</u>

Upon being discharged from St. Francis Hospital, Plaintiff was transported to the Town of Ulster Police Department Headquarters ("the police station"), where he was questioned by Faulkner and another Town of Ulster Police Department officer, Detective Moylan ("Moylan"). Def. Ex. A at 39-40; Def. Ex. B at. 34-37; *see also* Def. SOMF ¶ 13 ("Plaintiff was brought to the Town of Ulster Police Headquarters on or about January 25, 2019."). The circumstances surrounding Plaintiff's police custody from January 24, 2019, until he was transferred from St. Francis Hospital to the police station on January 25, 2019, are discussed below in Part III of this Decision and Order. Plaintiff admitted at his deposition that, when he was questioned at the police station, this was the first time he had any interaction with Faulkner regarding the underlying incident. Def. Ex. B at p. 34.

At his deposition, Faulkner acknowledged that Plaintiff had been in the hospital to seek medical attention for his injuries, and indicated that, while it would have been possible to interview him at the hospital, the police "were obviously more concerned with him getting the medical attention that he needed." Def. Ex. C at 53. There is no dispute that, before questioning Plaintiff at the police station, Faulkner discussed the case with Moylan and reviewed statements from Brandan and four additional witnesses. Def. SOMF ¶ 14. Faulkner contends that, in reviewing the witness statements, he learned that Plaintiff had previously barred Brandan from entering the home but Brandan had entered to obtain property from his bedroom. Def. Ex. C at 57-58. It is undisputed that, in reviewing Brandan's account of the incident, Faulkner learned that Plaintiff had approached Brandan and pointed a rifle at his chest just prior to an altercation. Def. SOMF ¶ 15.

At his 50-h hearing, Plaintiff testified that at the police station he spoke to Moylan with Faulkner present. Def. Ex. A at 39-40, 45. Plaintiff contended that, although Faulkner ended up

being the charging officer, Faulkner never asked him anything during the interview. *Id.* at 44.

Plaintiff asserted that, upon being asked by Moylan for a statement of what had happened on the

date in question, Plaintiff "started to tell him[,] and then [Moylan] referred to Brandan Fellows

as a victim so [Plaintiff] asked for a lawyer." *Id.* at 39-40. When asked how much he told

Moylan about what happened, Plaintiff responded, "I told him everything that happened. . . . I

told him everything that happened that day but once he referred to Brandan as a victim[,] I

requested a lawyer." *Id.* at 40.  Plaintiff contends that, after he asked for a lawyer, the interview

stopped and he was "booked, charged and sent in front of the judge." *Id.*[7]

When asked at his deposition what was the sum and substance of the conversation during

his interview at the police station, Plaintiff stated that Faulkner and Moylan were asking him

about his "side of the story," which he "started telling them" and which the officers were writing

down. Def. Ex. B at 34-35. Other than this conclusory statement, Plaintiff testified that he asked

the officers whether he was being arrested, to which the officers purportedly stated, "Well, not

right now"; Plaintiff also testified that he asked the officers whether Brandan was being arrested,

---

[7] Plaintiff contended at his 50-h hearing that "right after" he was booked and charged, he was brought to the Town of Kingston Court because an available judge could not be  located in the Town of Ulster Court, and the Town of Kingston Court judge set bail at $200,000. Def. Ex. A. at 41. It appears that this occurred on January 26, 2019. *Id.* at 42. Plaintiff contends that he remained incarcerated for nine (9) days until he was able to make bail. *Id.* at 44. If any of Plaintiff's false arrest/false imprisonment claims survived summary judgment, he could only obtain damages against Faulkner for the period from when Faulkner arrested him without a judicial warrant until a neutral magistrate determined to continue Plaintiff's detention. *See Williams v. Cnty. of Onondaga*, No. 5:22-CV-1367 (TJM/ATB), 2023 WL 2563181, at *9, n. 15 (N.D.N.Y. Feb. 21, 2023), *report and recommendation adopted,* 2023 WL 2563210 (N.D.N.Y. Mar. 16, 2023) ("[A] claim for false arrest can only be based on police conduct before the defendant is subject to arrest or other judicial process.") (citing *Wallace v. Kato*, 549 U.S. 384, 388-90, 127 S. Ct. 1091, 166 L.Ed.2d 973 (2007) (explaining that a claim for false arrest or imprisonment "ends once the victim becomes held pursuant to ... process–when, for example, he is bound over by a magistrate or arraigned on charges.... Thereafter, unlawful detention forms part of the damages for the 'entirely distinct' tort of malicious prosecution").

to which the officers purportedly stated that they did not think so or did not know. *Id.* at pp. 34-36.  At this time, Plaintiff invoked his right to counsel and the questioning stopped. *Id.* at 35-36.

Faulkner testified that, during the interview, Plaintiff indicated that, at the relevant time, he was in his bedroom and that he and Brandan were having an argument based on events from the previous day. Def. Ex. C at p. 61. According to Faulkner, Plaintiff contended he told Brandan he did not want him staying at his house anymore, and that he told Brandan to come to the house with the cops to get his stuff, but that Brandan showed up without the police. *Id.* Faulkner also testified that Plaintiff stated that there was a gun present, that Plaintiff picked up the gun and pointed it at Brandan, but the gun accidentally "went off." *Id.*  Faulkner further testified that, after Plaintiff stated that he picked up the gun, pointed it at Fellows, and it discharged, he and Moylan "started to ask some more questions to get into that. And [Plaintiff] stated that he couldn't really remember, it all wasn't completely clear, and that he wanted a lawyer.  And then after that, as soon as he says he wants a lawyer, we have to stop the interview and there's no more questioning." *Id.* at 61.

In addition, Faulkner testified as follows:

> It was believed that—that from reading [Brandan's] statement and everything, that Brandan was in fear for his life, obviously, because the gun is pointed at him. That he goes to push it to the side so it's not pointing at his chest. It goes off.
>
> At that point, he stayed [sic] that he was scared and they were fighting over the gun to get it from Mr. Wilson. And that, at some point, he stated that he does hit [Plaintiff]. I believe he stated that he hit him with the stock of the gun, I believe.

*Id.* at 62-63.

When Faulkner was asked to clarify Plaintiff's statement regarding the discharge of the firearm, Faulkner responded, "So he stated that, at some point, he had the gun. It was in

his hands. He pointed it at [Brandan]. And then, yes, it accidentally went off, is what he said." *Id.* at 63. When Faulkner was asked whether Plaintiff stated during the interview that he shot the gun, or if it went off in his hands before Brandan got it, or if it was discharged during the physical altercation, Faulkner responded, "If I remember correctly, it was in his hands. He stated that Fellows grabbed it, the front of it, and then they were struggling and that it went off." *Id*. p. 64. When asked whether this occurred in the bedroom or in the hallway, Faulkner responded as follows:

> Well, not in the hallway. It was—it was—all of it occurred from the doorway and, like, a foot within the doorway into the bedroom. So Mr. Fellows stated it was right at the doorway itself and just—you know, Spencer was in his room. And the doorway was opened[,] it was in the doorway. Spencer stated that he was right there inside the door, pointed it at him, and that's when it occurred. So it was the same general area.

*Id.* at 64-65. Faulkner stated that both Plaintiff's and Brandan's accounts placed them just inside the doorway to Plaintiff's bedroom, and Faulkner stated that he did not recall Plaintiff saying he was in his bed but rather recalled him saying that he was standing with the gun. *Id*. at 65-66.

Faulkner further testified as follows: "Where their accounts differed were [sic] the concept of Wilson stated [sic] that the gun went off accidentally. And Brandan said, 'He pointed it at me. When I pushed it to the side, he shot—he shot it,' like it went off." *Id.* at 66. When questioned further, Faulkner testified as follows: "Spencer stating [sic] that they're fighting over the gun and it goes off. Brandan is stating, 'The gun is facing[,] pointing at my chest. I pushed it to the side and it went off,' like—as in, like, he just missed being shot in the chest." *Id.* at 67. When Faulkner was asked whether he determined if either Plaintiff or Brandan was injured as a result of the incident, he responded that based

upon the interview he was aware that Plaintiff had physical injuries but did not know about Brandan because he had not seen him. *Id.* at 73.

Upon reviewing his interview notes, Faulkner further clarified that Plaintiff, who was deemed to be the suspect in the investigation, *id.* at 80, stated during the interview that Brandan entered his room "in an aggressive manner," that Plaintiff then pointed a loaded gun at him, and that an altercation occurred in Plaintiff's bedroom. *Id.* at 81-82. Faulkner further indicated that Brandan did not state that he went into the bedroom aggressively. *Id.* at 82. Faulkner also testified that Plaintiff indicated during the interview that he had had physical altercations with Brandan in the past, and that Brandan claimed in his statement that Plaintiff had pointed a loaded gun at him previously. *Id.* 83. When asked whether Plaintiff claimed he was in his bedroom with the gun "because he feared for his safety, out of security concerns or something else," Faulkner responded, "He stated that he was in his . . . room and got the gun. . . . I don't remember whether he said he was fearful of his life or what exactly was the statements that he made. I believe he stated that he went to go get it to protect himself, but I don't remember exactly the wording." *Id.* at 83.

Faulkner asserts that, "'[a]s a result of the witness statements obtained by Officer Moylan, particularly that of Brandan Fellows, and his own investigation, [he] believed there was sufficient cause to arrest the plaintiff for Attempted Assault in the First Degree." Def. SOMF ¶ 16 (citing Faulkner Dep., Dkt. No. 70-6, at 68). Plaintiff disputes this assertion, contending as follows:

> The undisputed facts known to Officer Faulkner immediately prior to the arrest of Plaintiff indisputably and patently establish Plaintiff's abject innocence of any and all wrongdoing, while also providing substantial, clear and uncontroverted probable cause to arrest Mr. Brandan Fellows for several serious felony crimes, including Burglary, Assault in the Second Degree, Assault in the First Degree and Attempted Murder, as it is undisputed that

12

> Mr. Fellows admitted to Defendant Faulkner that he unlawfully entered and remained within Plaintiff's dwelling while intending and subsequently causing serious physical injury to Plaintiff.

Pl. Response to Def. SOMF ¶ 16 (citing Faulkner Dep. at 42-43 and 84:7-23).

Plaintiff's response, and his record citations, do not necessarily contradict Faulkner's assessment that he obtained probable cause based upon witness statements and his own investigation, but rather amounts to a legal argument as to why Brandan—and not Plaintiff—should have been arrested.  Whether Faulkner had probable cause to arrest Brandan does not, by itself, mean that he also did not have probable cause to arrest Plaintiff. Nevertheless, because the critical question on this motion is whether Faulkner was aware of facts sufficient to form a reasonable belief that Plaintiff committed attempted assault in the first degree, the Court examines Plaintiff's record citations to determine whether they "indisputably and patently establish Plaintiff's abject innocence of any and all wrongdoing."

At pages 42 to 43 of his deposition, Faulkner stated as follows: that, after processing the scene, he learned that Plaintiff and Brandan had had a prior incident; that Plaintiff told Brandan he did not want him at the house without coming to get his stuff and did not want him staying there anymore; that when Brandan arrived at the house he went upstairs to get his stuff out of an upstairs bedroom which is next to Plaintiff's bedroom; and that, "[a]t that time, it was stated that Spencer was coming out of the room and Brandan was going towards the room. And Brandan opens the door and Spencer has the AR in his hand, is pointing it at Brandan. Brandan grabs the barrel of the gun and pushes it to the side and a round goes off."  Faulkner Dep. at 42-43. Faulkner testified that the statements to which he was referring were made by Brandan, Brandan's friend Leo, Leo's girlfriend Riley Goodrich, Plaintiff's daughter Alyssa, and Plaintiff's sister Adelaide. *Id.* at 44-45. Faulkner further testified that "[i]t was Brandan's

13

statement that led to [the] account" of what occurred upstairs, and that Leo and Riley "were in the car outside and they heard the round go off.  But Brandan is the one that gave most of that statement that occurred." *Id*. at 45. These record citations do not "indisputably and patently establish Plaintiff's abject innocence of any and all wrongdoing," but rather provide insight into the information Faulkner possessed before he made his probable cause determination.

At page 84 of his deposition, Faulkner indicates as follows: that he learned that Brandan's father had been doing work for Plaintiff; that, because Plaintiff was not happy with the work that was being performed, he stated to Brandan that he was "going to keep your dad's tools until he can come and we figure it out;" and that Brandan said Plaintiff could not keep his father's tools. *Id.* at 84. When asked if he understood that Brandan went upstairs to retrieve his father's tools, Faulkner responded as follows: "I do not know exactly what Brandan went into the house for. My interpretation was he went there to get stuff. I don't know exactly what it was. . . . I don't know if it was tools, his clothes  . . .  Unfortunately, I can't tell you exactly what Brandan was going there for because I am not him, so . . .  I don't remember if it was for tools or for his clothes or what exactly it was for. But I remember . . . [h]e was there to get stuff, his stuff. " *Id.* at 85-86. Again, this does not "indisputably and patently establish Plaintiff's abject innocence of any and all wrongdoing," but provides further insight to the information Faulkner possessed before he made his probable cause determination.

<u>Post-Interview</u>

Faulkner testified that, after the interview, Plaintiff was taken into custody and processed on the charge of attempted assault in the first degree. *Id.* at 67. There is no dispute that Plaintiff was brought before a Judge in the City of Kingston, where he was arraigned, and bail was set at $200,000.00. Def. SOMF ¶ 17.

14

Faulkner indicates that he was subpoenaed to testify before the grand jury, that Moylan

also testified, and that the grand jury voted not to indict Plaintiff. Def. Ex. C at 70-71; *see* Def.

Ex. A at 51 (indicating that the grand jury returned a no bill).

## II.    GOVERNING LEGAL STANDARD

On a motion for summary judgment the Court must construe the properly disputed facts

in the light most favorable to the non-moving party, *Scott v. Harris*, 127 S. Ct. 1769, 1776

(2007), and may grant summary judgment only where "there is no genuine issue as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "A

fact is material if it might affect the outcome of the suit under the governing law." *Baldwin v.

EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015).  An issue is genuine if the relevant

evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson

v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

The Court's inquiry upon summary judgment is "determining whether there is the need

for a trial — whether, in other words, there are any genuine factual issues that properly can be

resolved only by a finder of fact because they may reasonably be resolved in favor of either

party." *Anderson,* 477 U.S. at 250.  "When analyzing a summary judgment motion, the court

'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Galeotti v.

Cianbro Corp.*, No. 5:12-cv-00900 (MAD/TWD), 2013 WL 3207312, at *4 (N.D.N.Y. June 24,

2013) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36-37 (2d Cir. 1994)).  "The

moving party bears the burden of establishing the absence of any genuine issue of material fact."

*Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (citing *Celotex

Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "To determine whether a genuine issue of material

fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the

moving party." *Everett v. Dean*, No. 3:20-CV-01260 (AMN/ML), 2023 WL 5452753, at *4 (N.D.N.Y. Aug. 24, 2023) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Gibbs-Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir. 2002)).

Once a defendant has met this initial burden, the plaintiff must "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 323–24 (internal quotation marks omitted). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). Further, if the evidence favoring the nonmoving party is "merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 (internal citations omitted).

"Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (quoting *Matsushita*, 475 U.S. at 587).

## III.   ANALYSIS

As indicated above, Plaintiff brings claims against Defendant Faulkner alleging false arrest and false imprisonment in violation of the U.S. Constitution and New York State law. Faulkner moves for summary judgment contending that these claims should be dismissed because he had probable cause to arrest Plaintiff for attempted assault in the first degree. Further, he contends that, even if he did not have actual probable cause, he is entitled to qualified immunity on these claims. As indicated above, Plaintiff opposes this motion.

### A.   Whether Plaintiff's Claims Should Be Dismissed Because Faulkner Had Probable Cause to Arrest Him

16

Plaintiff's § 1983 false arrest claim stems from the Fourth Amendment right to be free from unreasonable searches and seizures, which includes the right to be free from arrest absent probable cause. *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006). A false arrest claim under § 1983 is substantially similar to a claim for false arrest under New York law. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996); *see also Nzegwu v. Friedman*, 605 F. App'x 27, 29 (2d Cir. 2015) (summary order) ("Claims for false arrest, whether brought under § 1983, pursuant to *Bivens,* or under state law, are analyzed pursuant to the same standards as the applicable state law's false arrest tort.") (citing *Jocks v. Tavernier,* 316 F.3d 128, 134 (2d Cir. 2003)).

"Under New York law, to prove the elements of false arrest, a plaintiff must show: '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" *Saunders v. Cavada*, 2024 WL 681228, at *5, n.6 (E.D.N.Y., Feb. 20, 2024) (Rep. Rec.) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)); *see Nzegwu*, 605 F. App'x at 29 (same) (citing *Jocks,* 316 F.3d at 134-35). "The existence of probable cause is an absolute defense to a false arrest claim." *Id.* at *5 (citing *Jaegly*, 439 F.3d at 152; *Weyant*, 101 F.3d at 852 ("[t]he existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest.")); *see Singh v. City of New York*, No. 23-24-CV, 2024 WL 319117, at *3 (2d Cir. Jan. 29, 2024) ("Probable cause is a complete defense to a constitutional claim of false arrest.") (citing *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995)). The reason for this is "[i]f an officer has probable cause to arrest, the confinement is privileged." *Nzegwu*, 605 F. App'x at 29 (citing *Jocks,* 316 F.3d at 135).

"'The same holds true for [a] false imprisonment claim[ ] because, under New York law, the claim is identical to a false arrest claim and the federal claim looks to the elements of the

state claim.'" *Saunders*, 2024 WL 681228, at *5 (quoting *Kilburn v. Vill. of Saranac Lake*, 413 Fed. Appx. 362, 363 (2d Cir. 2011) (citations omitted)). "'False arrest and false imprisonment are synonymous causes of action because the elements of the claims are identical.'" *Id.* (quoting *Levantino v. Skala*, 56 F. Supp. 3d 191, 200 (E.D.N.Y. 2014)).

Thus, "[u]nder both federal and New York state law, probable cause is a complete defense to a false arrest claim." *Triolo v. Nassau Cnty.*, 24 F.4th 98, 106 (2d Cir. 2022) (citing *Figueroa v. Mazza*, 825 F.3d 89, 99 (2d Cir. 2016) ("The existence of probable cause to arrest – even for a crime other than the one identified by the arresting officer – will defeat a claim of false arrest under the Fourth Amendment."); *De Lourdes Torres v. Jones*, 26 N.Y.3d 742, 759, 27 N.Y.S.3d 468, 47 N.E.3d 747 (N.Y. 2016) ("For purposes of the privilege element of a false arrest and imprisonment claim, an act of confinement is privileged if it stems from a lawful arrest supported by probable cause.")).

### 1. Detention from January 24, 2019, Until the Interview of January 25, 2019

Plaintiff appears to contend that his false arrest/false imprisonment claims against Faulkner should be assessed from when he was first detained by the police upon leaving his house on January 24, 2019. Plaintiff argues that he was "falsely arrested and imprisoned on January 24, 2019" by Faulkner, Dkt. No. 80 at CM/ECF p. 1, and contends that, "when [Faulkner was] asked whether Plaintiff was already in police custody and arrested [when Plaintiff was interviewed at the station], Defendant could not recall. However, Plaintiff was cuffed directly at the scene without being interviewed, he was in police custody during his hospital treatment, and forced to go the precinct directly instead of being sent home to recover." *Id*. at 11-12 (citing Def. Ex. C at 52:7-55:22). Plaintiff's reliance on Faulkner's deposition fails to establish a material

question of fact as to whether *Faulkner* played a role in detaining Plaintiff before the end of the interview on January 25, 2019.

Plaintiff admits that he has no knowledge of the identities of any of the officers who placed him in handcuffs and walked him to a police vehicle for transport that day. Def. SOMF ¶ 9. Further, he admits that, although Faulkner had seen him exit the house, Faulkner lost sight of Plaintiff as Plaintiff approached the other officers, because Faulkner was focused on securing the home and ensuring that there were no other suspects. *Id.* ¶ 10. Plaintiff presents no evidence indicating that Faulkner had any involvement in the decision to detain him on January 24, 2019.

Although there is some evidence that Plaintiff was in police custody from January 24, 2019, until his interview on January 25, 2019, this evidence does not indicate that Faulkner played any role in Plaintiff's detention during this time. Faulkner testified that other officers were with Plaintiff at the hospitals, and another officer brought Plaintiff to the police station even though Plaintiff willfully agreed to go. Def. Ex. C at pp. 52-53. Faulkner also testified that he does not recall whether Plaintiff was in handcuffs when he was brought to the police station, but contends – without contradiction – that Plaintiff was brought to the interview room (which was, at the time, located in a trailer adjacent to the police station) where he and Moylan interviewed Plaintiff without Plaintiff in handcuffs. *Id.* at pp. 55-57, 60. Further, Plaintiff testified that he that he had no interaction with Faulkner regarding the incident until he was interviewed at the police station on January 25, 2019. Def. Ex. B at p. 34. Plaintiff's speculation that Faulkner played some role in his detention between January 24, 2019 and the end of the interview on January 25, 2019 is insufficient to create a material question of fact for purposes of summary judgment. *Scotto*, 143 F.3d at 114.

Thus, even assuming Plaintiff was detained by the police without his consent on January 24, 2019, and remained in police custody until his interview at the police station, Plaintiff presents no factual basis upon which a reasonable factfinder could conclude that Faulkner was personally involved in Plaintiff's detention before the end of the interview. *See, e.g., Kravitz v. Purcell*, 87 F.4th 111, 129 (2d Cir. 2023) ("To 'establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show the ... the defendant's personal involvement in the alleged constitutional deprivation.'") (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013)); *Pellecier v. Marti*, No. 21-CV-4287 (BMC), 2024 WL 343973, at *4 (E.D.N.Y. Jan. 30, 2024) ("As to the claims for false arrest, false imprisonment, and malicious prosecution, there is no evidence in the record before me that Inv. Marti personally participated in any of the events about which plaintiff is complaining."); *Ndoye v. City of New Rochelle*, No. 23-CV-03805 (PMH), 2024 WL 308221, at *3 (S.D.N.Y. Jan. 26, 2024) ("As a fundamental prerequisite, to establish a § 1983 claim, a plaintiff must show the defendants' personal involvement in the alleged constitutional violation. Failing to allege that a defendant was personally involved in, or responsible for, the conduct complained of renders a complaint fatally defective on its face.") (internal quotation marks omitted); *id.* at *4 ("To state a claim for false arrest, Plaintiff must plead 'that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'") (quoting *Jocks,* 316 F.3d at 134-35); *Strong v. Watson*, No. 1:22-CV-00552 (JLS/MJR), 2023 WL 8439445, at *9 (W.D.N.Y. Sept. 26, 2023), *report and recommendation adopted,* 2023 WL 7647780 (W.D.N.Y. Nov. 15, 2023) ("Because the amended complaint is devoid of allegations from which to infer personal involvement by any individual defendant in either of Strong's arrests, the false arrest claim should be dismissed.")

(citing *Rodriguez v. City of New York*, 649 F. Supp. 2d 301, 305-06 (S.D.N.Y. 2009) (dismissing complaint for failure to state a claim where defendants were not shown to have directed or participated in plaintiff's arrest); *Hillary v. St Lawrence Cty.*, 8:17-CV-659, 2019 U.S. Dist. LEXIS 31720 (N.D.N.Y. Feb. 28, 2019) (false arrest claims dismissed where complaint contained no facts from which to infer that any of the individual defendants arrested plaintiff or directed that an officer arrest him)); *id.* at *9, n. 11 ("Strong alleges that Irons-Rindfleischm 'brought the charges.' Strong also attached, to his initial complaint, misdemeanor informations signed by Irons-Rindfleischm, which accuse Strong of welfare fraud and offering a false instrument for filing. Without any further detail as to how Irons-Rindfleischm was involved in Strong's arrest, the claim fails for lack of personal involvement.") (citing *Nunez v. City of New York*, 14-CV-4182, 2016 U.S. Dist. LEXIS 44678 (S.D.N.Y. Mar. 31, 2016) (granting motion to dismiss false arrest claim on grounds of lack of personal involvement where officers were only alleged to have investigated potions of the case, but were not alleged to have been involved in arrest); *Dallas v. Goldberg*, 95 Civ. 9076, 2000 U.S. Dist. LEXIS 10949 (S.D.N.Y. Aug. 2, 2000) ("[P]laintiff cannot assert a false arrest claim against [an officer] based [only] on the criminal complaint that she signed."); *Cruz v. City of New York*, 232 F. Supp. 3d 438, 455 (S.D.N.Y. 2017) (finding insufficient personal involvement where officer merely transported Plaintiff to precinct, processed him, signed complaint, and was listed in arrest records)); *Hernandez v. United States*, 939 F.3d 191, 199 (2d Cir. 2019) ("Under New York law, the elements of a false arrest and false imprisonment claim are: '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'") (quoting *McGowan v. United States*, 825 F.3d 118, 126 (2d Cir. 2016) (per curiam)).

21

Accordingly, to the extent Plaintiff seeks to hold Faulkner liable for any detention from January 24, 2019, until after the interview of January 25, 2019, Faulkner's motion for summary judgment is granted. The Court now turns to Plaintiff's false arrest and false imprisonment claims based on his detention following the interview of January 25, 2019.

### 2.    Detention Following the Interview of January 25, 2019

#### a.    Legal Standard Governing Existence of Probable Cause

Because Plaintiff was arrested without a judicial warrant, Faulkner bears the burden of establishing the existence of probable cause for the arrest. *Saunders*, 2024 WL 681228, at *5 (citing *Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010) ("When an arrest is not made pursuant to a judicial warrant, the defendant in a false arrest case bears the burden of proving probable cause as an affirmative defense.") (quoting *Broughton v. State*, 37 N.Y.2d 451, 373 N.Y.S.2d 87, 335 N.E.2d 310, 315 (1975)); *Jenkins v. City of New York*, 478 F.3d 76, 88 (2d Cir. 2007) (under New York law, an arrest made without a warrant is presumed unlawful unless the officer can prove the existence of probable cause)).

> Generally, "probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." [*Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)]. Probable cause is a mixed question of law and fact. *See, e.g.*, *United States v. Singletary*, 798 F.3d 55, 59 (2d Cir. 2015). Questions of historical fact regarding the officers' knowledge at the time of arrest are to be resolved by the jury. *See Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004). However, "where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court." *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007).
>
> Probable cause is "a fluid concept ... not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 156 (alteration in original) (quoting *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Although probable cause requires more than "mere suspicion" of wrongdoing, it focuses on "probabilities," not "hard certainties." *Id.* (quoting *Gates*, 462

U.S. at 231, 103 S. Ct. 2317). Ultimately, whether probable cause exists "depends on the totality of the circumstances" of each case, and is not susceptible to "precise definition or quantification into percentages." *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S. Ct. 795, 157 L.Ed.2d 769 (2003). "Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the [probable-cause] decision." *Id*. (alteration omitted) (internal quotation marks omitted) (quoting *Gates*, 462 U.S. at 235, 103 S. Ct. 2317). However, a determination of probable cause is not lacking in substance: it must be justified by a "belief of guilt" that is "particularized with respect to the person to be searched or seized." *Id*. (citing *Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979)).

*Dufort v. City of New York*, 874 F.3d 338, 348 (2d Cir. 2017).

"Probable cause exists in the false arrest context when an officer has 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested[.]'" *Jimenez v. City of New York*, No. 21-CV-6133 (RPK) (JRC), 2024 WL 198319, at *5 (E.D.N.Y. Jan. 18, 2024) (quoting *Fabrikant v. French*, 691 F.3d 193, 214 (2d Cir. 2012)); *see Triolo*, 24 F.4th at 106 ("Law enforcement officers have probable cause to arrest 'when they have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'") (quoting *Hernandez*, 939 F.3d at 199 (internal quotation marks omitted), and citing *De Lourdes Torres*, 26 N.Y.3d at 759, 47 N.E.3d 747 ("Probable cause consists of such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty.")).

Determining whether probable cause exists requires an objective assessment of the facts known to the officer at the time of arrest. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *see id.* at 153 ("Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause."). "To determine whether probable cause

existed, we consider the totality of the circumstances, reviewing plainly exculpatory evidence alongside inculpatory evidence to ensure the court has a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest." *Triolo* , 24 F.4th at 106 (internal quotation marks omitted). "In this analysis, we consider those facts available to the officer at the time of the arrest and immediately before it, keeping in mind that an officer may not disregard plainly exculpatory evidence." *Id.* (internal quotation marks omitted). "The significance of each of these factors may be enhanced or diminished by surrounding circumstances." *Id.* (internal quotation marks omitted).

A court's role in assessing false arrest claims "is not to overly scrutinize the decisions of police officers from its vantage in chambers, long after those decisions were made, but to determine whether the officers acted reasonably and in compliance with what the law requires based on what they knew at the time." *Rae v. Cnty. of Suffolk*, 693 F. Supp. 2d 217, 225 (E.D.N.Y. 2010) (citing *Panetta v. Crowley,* 460 F.3d 388, 395 (2d Cir. 2006)). "'Officers may rely on hearsay to establish probable cause, and a court may properly consider such hearsay at summary judgment.'" *Everett*, 2023 WL 5452753, at *6 (quoting *Dorsey v. Gannon*, No. 20-CV-1525 (PK/CPK), 2022 WL 4660555, at *3 (E.D.N.Y. Sept. 30, 2022)) (additional quotation marks and citation omitted). "An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime,[8] has probable cause to effect an arrest absent circumstances that raise doubts as to the [alleged] victim's veracity." *Singer,* 63 F.3d at 119. "The 'veracity of the informant and the basis for the informant's knowledge are two important factors.'" *Triolo*, 24 F.4th at 106 (quoting *Betts v.*

---

[8] Because Faulkner did not supply Brandan's statement, the Court has no way of knowing whether Brandan signed a sworn statement attesting to facts underlying Plaintiff's alleged attempted first degree assault.

*Shearman*, 751 F.3d 78, 82 (2d Cir. 2014) (internal quotation marks omitted)); *see McGuire v. Town of Cheektowaga*, No. 1:20-CV-01632, 2024 WL 385212, at *8 (W.D.N.Y. Jan. 31, 2024) ("'When information is received from a putative victim or an eyewitness, probable cause exists, . . . unless the circumstances raise doubt as to the person's veracity[.]'") (quoting *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) and citing *Lee v. Sandberg*, 136 F.3d 94, 103 (2d Cir. 1997) ("[A]bsent circumstances that raise doubts as to the victim's veracity[,] . . . [t]he veracity of citizen complaints who are the victims of the very crime they report to the police is assumed.")). "'[T]he probable cause standard does not require that the arresting officer affirmatively seek out reasons to doubt the victim or a witness where none are apparent.'" *McGuire*, 2024 WL 385212, at *8 (quoting *Rae v. Cnty. of Suffolk*, 693 F. Supp. 2d 217, 224 (E.D.N.Y. 2010)). "Rather, 'the 'uncorroborated testimony of a victim or other percipient witness' is usually sufficient on its own to support a finding of probable cause.'" *Id.* (quoting *United States v. Barbosa*, 2016 WL 3976559, at *4 (D. Mass. July 22, 2016), in turn quoting *Acosta v. Ames Dep't Stores, Inc.*, 386 F.3d 5, 10 (1st Cir. 2004)). "This is because '[a] victim is considered a 'reliable informant' even if 'his or her reliability has not theretofore been proved or tested.'" *Id.* (quoting *Barbosa*, 2016 WL 3976559, at *4, in turn quoting *Nelson v. Moore*, 470 F.2d 1192, 1197 (1st Cir. 1972)).

However, "'[w]hile probable cause is based on 'what the officer knew at the time of the arrest[,]' an officer may not 'deliberately disregard facts known to him which establish justification,'" *id. (*quoting *Jocks*, 316 F.3d at 135-36), or which are plainly exculpatory. *Triolo.*, 24 F.4th at 106. As the Second Circuit has explained as follows:

> When determining whether probable cause exists courts must consider those facts available to the officer at the time of the arrest and immediately before it, as probable cause does not require absolute certainty. Courts should look to the totality of the circumstances and must be aware that probable cause is a

25

> fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules. Nevertheless, an officer may not disregard plainly exculpatory evidence.

*Panetta,* 460 F.3d at 395 (internal quotation marks omitted); *see Nzegwu*, 605 F. App'x at 31 ("In assessing whether a reasonable officer would have determined that there was probable cause to make an arrest, a court must consider the officer's obligation to take into account exculpatory as well as inculpatory evidence.") (citing *Fabrikant,* 691 F.3d at 214).

### b. Analysis of Existence of Probable Cause

As indicated above, Faulkner charged Plaintiff with attempted assault in the first degree for his conduct on January 25, 2019. Under New York law, "[a] person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime." N.Y. Penal Law § 110.00. As provided for in § 120.10,

> A person is guilty of assault in the first degree when:
>
> 1. With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument; or
>
> 2. With intent to disfigure another person seriously and permanently, or to destroy, amputate or disable permanently a member or organ of his body, he causes such injury to such person or to a third person; or
>
> 3. Under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes serious physical injury to another person; or
>
> 4. In the course of and in furtherance of the commission or attempted commission of a felony or of immediate flight therefrom, he, or another participant if there be any, causes serious physical injury to a person other than one of the participants.

N.Y. Penal Law § 120.10.

To prove that a defendant committed attempted assault in the first degree, the People would have to prove that the defendant, "'[w]ith intent to cause serious physical injury to

26

another[,] ... attempted to cause such injury by means of a deadly weapon or dangerous instrument.'" *People v Warner*, No. 109457, 147 N.Y.S.3d 234, 237–38, 2021 N.Y. Slip Op. 02840, 2021 WL 1795511 (N.Y. A.D. 3 Dept., May 06, 2021) (quoting *People v. Watson,* 174 A.D.3d 1138, 1139, 105 N.Y.S.3d 199 (N.Y. A.D. 3 Dept., 2019) (internal quotation marks, ellipsis and citation omitted), *lv denied* 34 N.Y.3d 955, 110 N.Y.S.3d 658, 134 N.E.3d 657 (N.Y. 2019)); *see People v Coppins*, No. 109069, 103 N.Y.S.3d 676, 679, 2019 N.Y. Slip Op. 05021, 2019 WL 2528705 (N.Y. A.D. 3 Dept., June 20, 2019) ("As relevant here, in order to be found guilty of attempted assault in the first degree, the People were required to prove that, with intent to cause serious physical injury to another person, the defendant attempted to cause such injury by means of a deadly weapon.") (internal quotation marks and citations omitted). "'Serious physical injury' means … 'physical injury which creates a substantial risk of death, or which causes ... serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ.'" *Warner*, 147 N.Y.S.3d at 238 (quoting N.Y. Penal Law § 10.00(10)). "As with any attempt crime, the People [are] required to prove that defendant's conduct 'came 'dangerously near' commission of the completed crime.'" *Id.* at n. 1 (quoting *People v. Kassebaum,* 95 N.Y.2d 611, 618, 721 N.Y.S.2d 866, 744 N.E.2d 694 (N.Y. 2001), *cert denied* 532 U.S. 1069, 121 S. Ct. 2224, 150 L.Ed.2d 216 (2001)).

Here, Faulkner asserts that he had probable cause to arrest Plaintiff for attempted first degree assault based upon "witness statements obtained by Officer Moylan, particularly that of [Brandan] Fellows, and his own investigation." Def. SOMF ¶ 16. In an effort to defeat Faulkner's motion for summary judgment, Plaintiff makes a number of arguments that the Court addresses in turn.

First, Plaintiff argues that "[t]he dearth of probable cause was so readily apparent and obvious that the charges against [Plaintiff] were dismissed by the grand jury." Dkt. No. 80 at CM/ECF p. 1, *see id.* at CME/CF p. 8 ("The dismissal of the criminal charges constitutes evidence supporting a lack of probable cause, although not dispositive."). Plaintiff's argument, to the extent he contends that Faulkner lacked probable cause to arrest him because the grand jury declined to indict, is rejected. "The mere fact that the grand jury found no true bill on the charges against Plaintiff is insufficient to establish a lack of probable cause at the time of the arrest." *Rae*, 693 F. Supp. 2d at 225 (citing *Phillips v. Corbin,* 132 F.3d 867, 869 (2d Cir.1998) (grand jury's refusal to indict a defendant does not establish that officers lacked probable cause to arrest her); *Krause v. Bennett,* 887 F.2d 362, 371–72 (2d Cir.1989) (noting that "probable cause does not require an officer to be certain that subsequent prosecution of the arrestee will be successful")). Indeed, "just as probable cause may exist although a suspect is in fact innocent, probable cause may exist where the police do not know of the existence or validity of an exculpatory defense." *Jocks,* 316 F.3d at 135.

Plaintiff also appears to contend that it was improper to have Brandan testify before the grand jury, and that the determination to do so was the result of a "blatant exercise in corruption." *See* Dkt. No. 80 at CM/ECF p. 8 ("Permitting Brandan Fellows to testify in the grand jury cannot be explained by mere incompetence or stupidity, but only by a deliberate intent to pervert the purpose of the criminal justice system by using its own devices to falsely accuse an innocent victim, while simultaneously immunizing the true criminal from any consequences. [D]efendants, [sic] as such blatant exercises in corruption [sic] are inherently messy."). However, the decision to have Brandan testify before the grand jury was made by the District Attorney, and, for reasons stated above, does not impact Faulkner's probable cause assessment.

28

Second, Plaintiff contends that, because "'Federal Rule of Civil Procedure 56(c)(4) mandates that '[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated,'" Dkt. No.80 at CM/ECF p. 3 (quoting Fed. R. Civ. P. 56(c)(4)), and because "'a hearsay affidavit is not a substitute for the personal knowledge of a party,'" *id.* (quoting *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988), a court "'may strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements.'" *Id.* (quoting *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999)).  Although this may be a correct assessment of the law, Plaintiff fails to explain how it is applicable here given that no affidavits have been submitted either in support of or in opposition to the summary judgment motion (other than the affidavit of defense counsel Michael Cook, Esq., introducing evidence adduced through discovery).

Further, to the extent Plaintiff may be arguing that the Court should disregard any hearsay in Brandan's statement to the police, the argument is rejected. As indicated above, "[o]fficers may rely on hearsay to establish probable cause, and a court may properly consider such hearsay at summary judgment." *Everett*, 2023 WL 5452753, at *6. Plaintiff's argument on this issue is insufficient to warrant denial of Faulkner's motion.

Third, Plaintiff argues that "[t]he non-moving party . . . is not required to 'produce evidence in a form that would be admissible at trial in order to avoid summary judgment.'" Dkt. No.80 at CM/ECF p. 3 (quoting *Celotex*, 477 U.S. at 324).  Granted, this statement is correct as a general matter: a proper summary judgment motion may "be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves . . . ." *Celotex*,

477 U.S. at 324.  However, this point of law does not relieve the non-movant of its obligation, once a movant has met its initial burden, to "designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 323–24 (internal quotation marks omitted). As indicated above, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in its pleadings, *Rexnord*, 21 F.3d at 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. *Scotto,* 143 F.3d 114. Simply stated, Plaintiff's broad conclusory allegation citing *Celotex* does not demonstrate that a genuine question of material fact exists regarding Faulkner's probable cause determination.

Fourth, Plaintiff argues that Faulkner misapplies the fellow-officer rule because, in Plaintiff's view, Faulkner is contending that he obtained probable cause from his discussions with Moylan but did not arrive at his probable-cause determination independently, Dkt. No. 80 at CM/ECF pp. 4-7, and because he improperly relied upon Brandan's account of events without personally interviewing him. *Id*. at CM/ECF p. 12.

Plaintiff is correct that an officer, without doing an independent probable cause assessment, can obtain probable cause from a fellow officer only if the fellow officer has probable cause for an arrest. *See Nzegwu*, 605 F. App'x at  30 ("[U]nder the collective knowledge doctrine, because Agent Friedman communicated his knowledge of the case to Detective Jackson, Detective Jackson will be held to have had arguable probable cause to arrest if Agent Friedman did."); *cf. Crawford v. City of New York*, 477 F. App'x 777, 779 (2d Cir. 2012) ("If one officer in a police department has knowledge of facts that establish probable cause to arrest a suspect, the suspect suffers no constitutional deprivation if he is arrested by a different officer who lacks such knowledge.").  But, although Faulkner asserts that he spoke to Moylan about the case before he and Moylan interviewed Plaintiff, he asserts that his probable-cause determination

was the "result of the witness statements obtained by Officer Moylan, particularly that of Brandan Fellows, *and his own investigation*." Def. SOMF ¶ 16 [emphasis added]. Thus, he does not contend that he adopted Moylan's probable cause assessment (if Moylan reached one).

Further, as a general proposition, the fellow-officer rule allowed Faulkner to rely on the contents of the police file, including Brandan's statement taken by Moylan, in assessing the existence of probable cause. *See, e.g.*, *Mobley v. Kirkpatrick*, 778 F. Supp. 2d 291, 300, n. 1 (W.D.N.Y. 2011) ("New York courts have held that information received from another police officer is presumptively reliable. In the instant case, Det. Reese relied on the information contained in the Buffalo Police Department's Major Case file for the facts giving rise to probable cause to arrest petitioner. The file contained a photograph of Petitioner, witnesses' statements about the Gibson Street shooting, a photo array, and information indicating that Petitioner had been identified as the shooter. Thus, as a matter of New York law and the 'fellow officer rule', Det. Reese had a sufficient basis to establish that there was probable cause for Petitioner's arrest."); *cf. Saunders*, 2024 WL 681228, at *6, n. 7 ("Pursuant to the collective knowledge doctrine, facts known to one member of a law enforcement team cooperating in an investigation are presumed to be shared by the others when determining the existence of probable cause to arrest.") (citing *Savino v. City of New York*, 331 F.3d 63, 74 (2d Cir. 2003)); *Hoyos v. City of New York*, 999 F. Supp. 2d 375, 386 (E.D.N.Y. 2013) ("Under the fellow officer doctrine, an arrest is permissible even if an arresting officer lacks personal knowledge sufficient to establish probable cause, so long as the officer acts as a result of communication with a fellow officer and the police as a whole were in possession of information sufficient to constitute probable cause to make the arrest. The pertinent inquiry with respect to information transmitted by a fellow officer is directed to the nature and reliability of the information possessed by the person or agency

transmitting the information. A police officer is generally entitled to rely on the contents of a fellow officer's report.") (internal quotation marks omitted).

Plaintiffs' arguments addressed to the fellow-officer rule are, in themselves, insufficient to defeat Faulkner's motion for summary judgment.

Fifth, Plaintiff argues that the facts known by Faulkner were insufficient to amount to probable cause. Faulkner counters that the witness statements, his own investigation, and the undisputed facts are sufficient to establish probable cause.

The initial question on this motion is whether Faulkner was presented with undisputed evidence reasonably indicating that Plaintiff, with intent to cause serious physical injury to Brandan, attempted to cause such injury by means of the rifle located in Plaintiff's bedroom. *See McGuire*, 2024 WL 385212, at *8 ("'The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers, . . . or may require a trial if the facts are in dispute[.]'") (quoting *Weyant*, 101 F.3d at 852 (internal citations omitted)). Although Faulkner does not supply the witness statements, there is no dispute that Faulkner learned from Brandan's statement that Plaintiff approached Brandan and pointed a rifle at his chest just prior to an altercation. Def. SOMF ¶ 15. It is also undisputed that, during his investigation, Faulkner recovered a shell casing in Plaintiff's bedroom. Def. SOMF ¶ 12. Plaintiff contends that he and Brandan wrestled over control of Plaintiff's rifle in, or in the entrance to, Plaintiff's bedroom, Def. Ex. A at 20-24, Def. Ex. C at 64-65, and there is no dispute that a round was fired from the rifle while the two wrestled for control of it. Def. SOMF ¶ 4. This information is probative, but not dispositive, of whether Plaintiff intentionally attempted to discharge the weapon to cause serious bodily injury to Brandan.

32

Further, Faulkner contends that Brandan's statement indicates that Brandan was in fear for his life when the rifle was pointed at him, and that, when he pushed the barrel of the rifle to the side, Plaintiff fired the rifle. Def. Ex. C at 62-63. Based on Faulkner's interview with Plaintiff and Faulkner's investigation including review of the witness statements, it was Faulkner's understanding that Plaintiff admitted that he was holding the rifle and was pointing it at Brandan when they wrestled for control of the rifle, Def. Ex. C at 61, but that the two presented differing accounts of the discharge of the rifle. *Id.* at 61-67. Plaintiff contended that rifle discharged inadvertently or because of Brandan's actions, and Brandan contended that Plaintiff intentionally discharged the weapon just as Brandan pushed it to the side. *Id.* at 66-67 ("Where their accounts differed were the concept of Wilson stated that the gun went off accidentally. And Brandan said, 'He pointed it at me. When I pushed it to the side, he shot – he shot it,' like it went off. . . . Brandan is stating, 'The gun is facing pointing at my chest. I pushed it to the side and it went off,' *like – as in, like, he just missed being shot in the chest*.") (emphasis added).

"Probable cause requires an officer to have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Panetta,* 460 F.3d at 395 (internal quotation marks omitted). An officer need not be certain that a subsequent prosecution will succeed, and it is "of no consequence that a more thorough or more probing investigation might have cast doubt upon the situation." *Krause,* 887 F.2d at 371 (internal quotation marks omitted). "The Second Circuit has expressly held that 'the fact that an innocent explanation may be consistent with the facts alleged does not negate probable cause and an officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause.'" *McMillan v. Cap. One*

*Bank, N.A.*, No. 20 CIV. 7981 (NRB), 2022 WL 799661, at *4 (S.D.N.Y. Mar. 16, 2022)

(quoting *Panetta*, 460 F.3d at 395-96 (internal quotation marks, alterations, and citations

omitted), and citing *Curley*, 268 F.3d at 70 ("[W]e have found probable cause where a police

officer was presented with different stories from an alleged victim and the arrestee."); *Creighton*

*v. City of New York*, No. 12 Civ. 7454 (PGG), 2017 WL 636415, at *27 (S.D.N.Y. Feb. 14,

2017) (collecting cases)).  As a general matter, "[a]lthough a better procedure may have been for

[Faulkner] to investigate plaintiff's version of events more completely, the arresting officer does

not have to prove plaintiff's version wrong before arresting [him]."" *Id.* (quoting *Curley*, 268

F.3d at 70).  "Once a police officer has a reasonable basis for believing there is probable cause,

he is not required to explore and eliminate every theoretically plausible claim of innocence

before making an arrest." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997)).

"Probable cause does not require absolute certainty." *Boyd v. City of New York*, 336 F.3d 72, 76

(2d Cir. 2003).

      However, as explained above, "an officer may not 'deliberately disregard facts known to

him which establish justification,'" *McGuire*, 2024 WL 385212, at *8 (quoting *Jocks*, 316 F.3d

at 135-36), or which are plainly exculpatory. *Triolo.*, 24 F.4th at 106; *see Nzegwu*, 605 F. App'x

at 31 ("In assessing whether a reasonable officer would have determined that there was probable

cause to make an arrest, a court must consider the officer's obligation to take into account

exculpatory as well as inculpatory evidence."); *Panetta,* 460 F.3d at 395 ("[A]n officer may not

disregard plainly exculpatory evidence.").

      Here, as indicated earlier, there is no genuine dispute that Faulkner learned from

Brandan's statement that Plaintiff approached Brandan and pointed the rifle at his chest just prior

to an altercation, that the rifle was discharged while Plaintiff and Brandan wrestled over the rifle,

and that this occurred in or near the entrance of Plaintiff's bedroom. This version of events was consistent with the undisputed fact that Faulkner recovered a shell casing in Plaintiff's bedroom, and for the other witnesses' statements that they heard a gun being discharged. Furthermore, although such an additional consistency is not necessary, the Court observes that this version of events was also consistent with Faulkner's uncontroverted deposition testimony that, during Plaintiff's interview by Detective Moylan and Faulkner at the police station, Plaintiff stated that, when Brandon came to the house to get his stuff, there was a gun present, that Plaintiff picked up the gun and pointed it at Brandan, and the gun "went off." Def. Ex. C at pp. 57-58, 61-63, 65-67, 81.[9]

---

[9] The Court notes that no portion of Plaintiff's 50-h Hearing testimony or deposition testimony controverts Faulkner's deposition testimony that, during Plaintiff's interview at the police station, Plaintiff told Moylan and Faulkner the above-stated facts (i.e., that, when Brandon came to the house to get his stuff, there was a gun present, Plaintiff picked up the gun and pointed it at Brandan, and the gun "went off."). *See generally* Def. Ex. A; Def. Ex. B. To the contrary, during both his 50-h Hearing and deposition, Plaintiff admitted that, shortly after the interview at the police station began, it stopped. *See* Def. Ex. A, at pp. 39-40 ("He asked me for a statement of what happened, I *started* to tell him and then he referred to Brandon Fellows as a victim so I asked for a lawyer.") (emphasis added); Def. Ex. B, at 34-36 ("And I *started* telling him [my side of the story]. And, you know, they were writing everything down. And I just – I got the feeling, I said, you know, 'Am I being arrested?' And they said, 'Well, not right now," whatever. And then they just kind of, like, heard my sister in my head saying, 'Lawyer, don't talk to these people. Lawyer. Just say "lawyer" and we'll work this out.' And so I told them, I said, 'I want a lawyer.' So that was the end of the questioning.") (emphasis added). Granted, subsequently, during Plaintiff's 50-h Hearing, he attempted to withdraw that admission, stating that his account of events was complete. *See* Def. Ex. A ("I told him everything that happened. . . . I told him everything that happened that day but once he referred to Brandon as a victim I requested a lawyer."). For the sake of brevity, the Court will not linger on the fact that, even if the Court were to credit Plaintiff's assertion that he gave Moylan and Faulkner a complete account of his version of events at the police station, that complete account would not have differed materially from the above-stated facts, except for the asserted fact that Plaintiff pointed the gun at Brandan before Brandan grabbed it and it went off. *See generally* Def. Ex. A, at pp. 19-25; *cf.* Def. Ex. B, at 26-28. More important is the fact that Plaintiff made no such attempt to withdraw a similar admission at his deposition, Def. Ex. B, at 34-36 (again testifying that his account was incomplete), forcing the Court to make a credibility determination regarding Plaintiff's testimony pursuant to *Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir.

As also indicated earlier, the main difference between Plaintiff's version of events and Brandan's version of events is whether the gun went off accidentally (because of Brandan's action of grabbing the gun and wrestling for control of it) or intentionally (just as Brandan pushed the gun to the side, to avoid being shot in the chest). The relevant question then is whether Plaintiff's version of events constitutes circumstances that raise doubt as to Brandan's veracity: in other words, whether Plaintiff's version of events was plainly exculpatory such that it could not be freely disregarded by Faulkner.

Although at first glance this question appears to present a close call, after a careful review of the admissible record evidence, the Court finds that the record contains admissible evidence establishing why Faulkner rejected Plaintiff's claim that he did not discharge the rifle intentionally:[10] Faulkner had sufficient reason to doubt Plaintiff's credibility based on Plaintiff's sudden loss of memory (during his interview by Moylan and Faulkner) when asked for the details of his claim that the rifle was discharged accidentally.[11]

---

2005) (setting forth narrow exception to rule prohibiting the rendering of credibility determinations on motion for summary judgment).

[10] The Court does not consider Plaintiff's contention that Brandan admitted at a bail hearing that he was the one that discharged a weapon because this information was not available to Faulkner at the time of the arrest.

[11] The Court notes that it need not, and does not, consider Plaintiff's implied argument that Faulkner's determination was influenced by Brandan's uncle "who was also a police officer that responded to the scene." Dkt. No. 80 at CM/ECF p. 12. Plaintiff points to no admissible record evidence establishing that Brandan's uncle was a police officer who responded to the scene, or that Faulkner had any discussions with this individual about the events in issue. Furthermore, Plaintiff's reference to Brandan's uncle appears to be to Defendant *Steven* Fellows who has not appeared in this action, *see generally*, Ct. Dkt. Presumably, Steven Fellows has not done so because he was never successfully served with process in this action (apparently being retired from the Town of Ulster Police Department). *See, e.g.,* Dkt. No. 25; Dkt. No. 29-1. Ordinarily, the Court would be inclined to direct Plaintiff to show cause why his claims against Defendant Steven Fellows should not be dismissed for failure to prosecute pursuant to Fed. R. Civ. P. 41(a)(2). However, the Court notes that Steven Fellows was the subject of an unsuccessful attempt to add a conspiracy claim in this action, *see* Dkt. 51 at 23 ("Plaintiff had

As Faulkner repeatedly explained in his deposition, his determination of Plaintiff's credibility was rendered after Plaintiff suddenly "couldn't really remember" all the details after testifying that the gun went off "accidentally." *See* Def. Ex. C at 61 ("[Plaintiff] did state that there was gun was there. He stated that he picked up the gun and pointed it at Brandan but then he said that it accidentally went off. After he stated that, we started to ask some more questions to get into that. And he stated that he couldn't really remember, it all wasn't completely clear, and that he wanted a lawyer."), *accord*, Def. Ex. C at 63 ("So [Plaintiff] stated that, at some point, he had the gun. It was in his hands. He pointed it at him. And then, yes, it accidentally went off, is what he said. And then he said that he couldn't really remember all the details. And that's when he asked for a lawyer.").  It was only then that Faulkner assigned more credibility to Brandan's account of events than to Plaintiff's account of events.  *See* Def. Ex. C at 62 ("So [Plaintiff] was coherent and knew what day it was and all of that. He just seemed like the recollection of what had occurred, he didn't know exactly. . . .  *It was believed that – and from reading [Brandan's] statement and everything*, that Brandan was in fear for his life, obviously, because the gun is

---

previously attempted to include a cause of action for conspiracy predicated upon the purported actions of Steven Fellows. The motion to include the conspiracy cause of action was denied because the 'conclusory claim alleging a conspiracy,' without personal knowledge of facts, was insufficient to withstand a motion to dismiss."), was the subject of an unsuccessful malicious-abuse-of-process claim, *see id.* ("[A]s Defendants argue, it is those same conclusory allegations upon which Plaintiff bases his claims for malicious abuse of process; without the conclusory allegations that Brandon Fellows contacted Steven Fellows, who thereafter 'directed or importuned' the moving-defendants to act with an improper purpose, there are no facts which support a cause of action for malicious abuse of process. For the same reason that the conspiracy causes of action could not be added to the pleadings, the causes of action for malicious abuse of process must be dismissed."), and was effectively one of the Town Defendants against whom Judge McAvoy found that Plaintiff had failed to state a claim, *see id.* at 36, 37.  As a result, under the circumstances, the Court directs the Clerk of Court to terminate Steven Fellows as a Defendant in this action, effective October 17, 2022 (the date of Judge McAvoy's denial of Plaintiff's motion to amend), *see* Dkt. No. 58, at 9 (referring to only one "remaining Defendant in this action").

pointing at him. That he goes to push it to the side so it's not pointing at his chest.") (emphasis added).

Of course, a police officer may choose to rely on either of two conflicting sworn statements in determining probable cause. *See Christman v. Kick*, 342 F. Supp. 2d 82, 88 (D. Conn. 2004) (granting summary judgment where plaintiff and the other driver in a car accident accused each of criminal conduct, and explaining that "a police officer may chose [sic] to rely on either of two conflicting sworn statements in determining probable cause, especially when he personally took the statements and was thus able to assess the credibility of the two victims/perpetrators, there was some uncontroverted evidence that supported one of the statements . . . , and there was no other evidence that raised questions as to the veracity of the statement upon which he relied"); *see, e.g., Pawlicki v. City of Ithaca*, 993 F. Supp. 140, 145 (N.D.N.Y. 1998) (Scullin, J.) (granting summary judgment on false arrest claim stemming from incident between plaintiff pedestrian and driver where the competing eyewitness accounts implicated either the plaintiff or the driver in criminal conduct); *cf. United States v. LaTray*, 739 F. Supp. 88, 93 n.3 (N.D.N.Y. 1990) (Munson, J.) (noting that, under the Restatement (Second) of Torts, if "A sees B and C bending over a dead man, . . . [and] B and C each accuse the other of murdering [the victim] . . . A is privileged to arrest either or both.") (citing Restatement (Second) of Torts § 119, comment j (1965)).

For all of these reasons, the Court grants this much of Faulkner's motion for summary judgment (i.e., the extent that he had probable cause to arrest Plaintiff following the interview of January 25, 2019).

**B.      Whether, in any Event, Plaintiff's Claims Should Be Denied Based on Qualified Immunity**

Faulkner further argues that, even if the Court were to find that there was not actual probable cause to arrest Plaintiff, he is nonetheless protected from liability as a matter of law based on the doctrine of qualified immunity with regard to Plaintiff's false arrest and false imprisonment claims.  Dkt. No. 70-2 at CM/ECF pp. 9-12. Plaintiff contends that Faulkner is not entitled to qualified immunity. Dkt. No. 80 at CM/ECF pp. 8-14.

There are separate standards for qualified immunity for claims under federal and state law. *Triolo*, 24 F.4th at 107-110. The Court addresses both here.

### 1.    Qualified Immunity Under Federal Law

Qualified immunity shields government officials from liability for money damages for violation of a right under federal law if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It allows government officials to make reasonable judgments and is said to protect "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"Even where actual probable cause does not exist, an officer may be entitled to qualified immunity on a [Section] 1983 false arrest claim if his actions were objectively reasonable or if 'arguable probable cause' existed at the time of the arrest." *Triolo v. Nassau Cnty.*, 24 F.4th 98, 107 (2d Cir. 2022) (citing *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016)). An officer has arguable probable cause "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Wilson v. Town of Cheektowaga*, No. 1:18-CV-01255 (EAW), 2023 WL 1784673, at *6 (W.D.N.Y. Feb. 6, 2023) (citation omitted).

"Arguable probable cause is an 'analytically distinct test for qualified immunity' that 'is more favorable to the officers than the one for probable cause.'" [*Reeder v. Vine*, No. 6:20-CV-06026 (EAW), 2023 WL 2044126, at * 7 (W.D.N.Y. Feb. 16, 2023)](quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004)). Whether "an officer's conduct was 'objectively reasonable' " depends on "the information possessed by the officer at the time of the arrest," not "the subjective intent, motives, or beliefs of the officer." *Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010) (citation omitted). "Put another way, an arresting officer will find protection under the defense of qualified immunity unless 'no reasonably competent officer' could have concluded, based on the facts known at the time of arrest, that probable cause existed."

> *Rodriguez v. City of N.Y.*, 291 F. Supp. 3d 396, 409 (S.D.N.Y. 2018) (quoting
> *Figueroa*, 825 F.3d at 100).

*Everett*, 2023 WL 5452753, at *8.

As the Second Circuit has explained, "'[a]rguable' probable cause should not be misunderstood to mean 'almost' probable cause....  If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer.'" *Singh*, 2024 WL 319117, at *3 (quoting *Jenkins*, 478 F.3d at 87). "Under this standard, 'an 'arresting officer is entitled to qualified immunity as a matter of law [only] if the *undisputed facts* and all permissible inferences favorable to the plaintiff show that officers of reasonable competence could disagree on whether the probable cause test was met.'" *Id.* (quoting *McClellan v. Smith*, 439 F.3d 137, 147–48 (2d Cir. 2006) (alterations adopted), in turn quoting *Robison v. Via*, 821 F.2d 913, 921 (2d Cir. 1987)).

"As explained above, [Defendant] lacked actual probable cause because he ignored exculpatory evidence and information that undermined the veracity of the alleged victim[]. But that conclusion does not preclude a finding of arguable probable cause. On this record, even construed in the light most favorable to [Plaintiff], it is not clear that *no* reasonable officer could have believed that probable cause existed." *Triolo*, 24 F.4th at 108 (citing *Figueroa*, 825 F.3d at 100).

Here, the undisputed evidence indicates that Faulkner responded to a 911 call of a domestic dispute involving a shot fired at Plaintiff's residence. Upon arriving at the scene and conducting an investigation, he discovered an empty shell casing in Plaintiff's bedroom.  He subsequently learned that, the day before the 911 call, Plaintiff and Brandan had been in a dispute over Plaintiff taking Brandan's father's tools, and that because of this dispute Plaintiff

barred Brandan from returning to the residence without a police escort. Faulkner also learned

that, on the date of the 911 call, Brandan had returned to the residence and, according to

Plaintiff, burst into Plaintiff's bedroom in an apparent attempt to retrieve the father's tools.

There is also no dispute that Faulkner learned from Brandan's statement, and from Plaintiff's

interview, that Plaintiff approached Brandan and pointed a rifle at his chest just prior to an

altercation between the two. Further, there is no dispute that Faulkner also learned that Plaintiff

and Brandan struggled over control of the rifle, and that during the struggle the rifle was

discharged. Although Plaintiff contended that he did not intentionally discharge the rifle,

Faulkner was aware that Brandan contended that Plaintiff intentionally discharged the rifle when

Brandan pushed the barrel to the side of his body, and that Brandan was afraid for his life by this

conduct.

Despite the fact that the Court finds that Faulkner has not established that he had actual

probable cause to arrest Plaintiff for attempted assault in the first degree, "[t]he question [when

addressing qualified immunity] is 'not whether the officer *should have* acted as he did.'" *Triolo*,

24 F.4th 107–08 (quoting *Figueroa*, 825 F.3d at 100). "Instead, it is 'whether *any* reasonable

officer, out of the wide range of reasonable people who enforce the laws in this country, *could*

*have* determined that' probable cause existed." *Id.* at 108 (quoting *Figueroa*, 825 F.3d at 100).

"Indeed, as the Supreme Court has repeatedly recognized, 'qualified immunity protects all but

the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Ziglar v. Abbasi*,

––– U.S. –––, 137 S. Ct. 1843, 1867, 198 L.Ed.2d 290 (2017) (internal quotation marks

omitted)). "Whether a particular officer falls into either of these categories turns on 'whether it

would have been clear to a reasonable officer that the alleged conduct was unlawful in the

41

situation he confronted.'" *Id.* (quoting *Ziglar*, 137 S. Ct. at 1867 (internal quotation marks omitted).

The Court concludes that officers of reasonable competence could disagree whether on January 25, 2019, probable cause existed to arrest Plaintiff for assault in the first degree for his conduct on January 24, 2019. Indeed, as indicated above, the Second Circuit has held that the fact that an innocent explanation may be consistent with the facts alleged does not negate probable cause and an officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause. *McMillan,* 2022 WL 799661, at *4. Further, although a "better procedure" would have been for Faulkner to investigate Plaintiff's version of events more completely, an arresting officer does not have to prove a plaintiff's version wrong before arresting him. *Id.* As the Second Circuit has stated, "Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest.'" *Ricciuti*, 124 F.3d at 128.

Although Faulkner did not prove he had actual probable cause to arrest Plaintiff,  a reasonable officer could have believed that there was probable cause to arrest Plaintiff for attempted assault in the first degree based on Brandan's statement and the undisputed evidence that the rifle was discharged while Plaintiff and Brandan struggled over it after Plaintiff pointed it at Brandan's chest. *Cf. Harig v. City of Buffalo*, No. 22-30-CV, 2023 WL 3579367, at *4 (2d Cir. May 22, 2023) ("A reasonable officer could have believed there was probable cause to arrest Harig solely based upon Zachary's supporting deposition.") (citing *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) ("[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness.") (internal quotation marks omitted)).  When viewing the admissible

evidence in the light most favorable to Plaintiff, the Court cannot say that no reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, could have determined that probable cause existed. *See Harig,* 2023 WL 3579367, at *5 ("Viewing the admissible evidence in the light most favorable to Harig, we cannot say that '[*no*] reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, *could have* determined that' probable cause existed.'") (quoting *Triolo,* 24 F.4th at 108, in turn quoting *Figueroa*, 825 F.3d at 100).

For all of these reasons, the Court finds that, at the very least, Faulkner is entitled to qualified immunity on Plaintiff's federal false arrest claim.

### 2.     Qualified Immunity Under New York State Law

"New York law grants government officials qualified immunity on state law claims, including false arrest claims, if their actions entail 'making decisions of a judicial nature,' unless 'there is bad faith or the action taken is without a reasonable basis.'" *Triolo*, 24 F.4th at 108–09 (quoting *Arteaga v. State of New York*, 72 N.Y.2d 212, 216, 532 N.Y.S.2d 57, 527 N.E.2d 1194 (N.Y. 1988)). "In other words, New York immunity law requires both objective and subjective reasonableness." *Id.* at 109 (citing *Lore v. City of Syracuse*, 670 F.3d 127, 166 (2d Cir. 2012) ("In contrast to the federal standard, which is objectively reasonable reliance on existing law, the New York standard for entitlement to qualified immunity has both objective and subjective components.") (internal citations and quotation marks omitted)).

"As to the first prong, a decision is 'of a judicial nature' if it 'requires the application of governing rules to particular facts,' or if it is 'an exercise of reasoned judgment which could typically produce different acceptable results.'" *Id.* (quoting *Arteaga*, 72 N.Y.2d at 216-17, 532 N.Y.S.2d 57, 527 N.E.2d 1194 (internal quotation marks omitted)). Here, Faulkner's decision to

43

arrest Plaintiff based on what he believed to be probable cause required the application of governing rules to facts. *Id.* As explained above, that decision was not objectively unreasonable and could have produced different acceptable results. *Id.*; *cf. Martinez v. Hasper*, No. 21-2975, 2023 WL 4417355, at *3 (2d Cir. July 10, 2023) ("For the reasons explained above, Hasper's belief that he had probable cause to use lethal force was not 'objectively unreasonable and could have produced different acceptable results.'") (quoting *Triolo*, 24 F.4th at 109). Accordingly, Faulkner satisfies the objective component of the New York qualified immunity test.

"As to the second prong, an officer cannot satisfy the subjective component 'if there are undisturbed findings of bad faith' in the record." *Triolo*, 24 F.4th at 109 (quoting *Lore*, 670 F.3d at 166 (internal quotation marks omitted)). Plaintiff argues that Faulkner is not entitled to qualified immunity on the state law claim because he effectuated Plaintiff's arrest without the requisite probable cause, and therefore acted in bad faith. Dkt. No. 80 at CM/ECF p. 13.

Plaintiff's reasoning is circular. If every officer who arrested a suspect without actual probable cause acts in bad faith, then no officer would be entitled to qualified immunity under New York law. Rather, the Court concludes that, because Faulkner acted upon Brandan's statement that Plaintiff discharged the rifle immediately upon Brandan deflecting it away from his chest, and because Brandan contended that he was in fear for his life, Faulkner did not act in bad faith in charging Plaintiff with attempted assault in the first degree even if he did not credit Plaintiff's account. *Cf. Triolo.*, 24 F.4th at 109–10 ("The only fact Triolo points to as showing bad faith is that Lee was not interested in hearing Debra's version of events while he was arresting Triolo. This alone is insufficient to support a finding of malice. Viewed in a light most favorable to Triolo, the record could only support a finding of callousness or indifference in making the arrest, and such a finding does not preclude the legal conclusion that Lee acted in

subjective good faith. Accordingly, Lee satisfies both prongs of the New York immunity test and is immune from Triolo's state law false arrest claim."); *see also Martinez,* 2023 WL 4417355, at *3 ("[A]bsent any evidence to the contrary, Hasper's testimony that he feared for his safety and for the safety of others demonstrates that his conduct [of using lethal force] was not made in bad faith.").

For all of these reasons, the Court finds that, at the very least, Faulkner has satisfied both prongs of the New York immunity test and is immune from Plaintiff's state law false arrest claim.

**ACCORDINGLY**, it is

**ORDERED** that Defendant Faulkner's motion for summary judgment, Dkt. No. 70, is **<u>GRANTED</u>**, and Plaintiff's remaining claims against Faulkner (for false arrest and false imprisonment) are **<u>DISMISSED</u>**; and it is further

**ORDERED** that, for reasons discussed above in note 11 of this Decision and Order, the Clerk of Court shall **TERMINATE** Steven Fellows as a Defendant in this action, effective October 17, 2022.

Dated:  March 26, 2024
        Syracuse, New York


Glenn T. Suddaby
U.S. District Judge